# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Cynthia Hess,

                Plaintiff,       Case No. 13-cv-10696
                                   Hon. Judith E. Levy
v.                           Mag. Judge R. Steven Whalen

Metropolitan Life Insurance
Company,

                Defendant.

_____/

# OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [31] AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [33]

This is an Employee Retirement Income Security Act ("ERISA") case. Pending are cross motions for summary judgment. (Dkt. 31 and 33.)

I.    Background

Plaintiff brought suit on February 19, 2013, claiming that defendant improperly terminated her long-term disability benefits

related to her claimed disabilities of orthostatic intolerance[1] and irritable bowel syndrome under an insurance policy governed by ERISA, 29 U.S.C. § 1001 *et seq.* (Dkt. 1.)[2]

Plaintiff, at the time of the events relevant to this claim, was employed as an audit manager at an accounting company. Her long-term-disability coverage was effective on January 1, 2009. (AR 884.)[3] Under that policy, defendant would not pay benefits for pre-existing conditions, defined as "a Sickness or accidental injury for which [the policyholder]: received medical treatment, consultation, care, or services; took prescription medication or had medications prescribed; or had symptoms or conditions that would cause a reasonably prudent person to seek diagnosis, care, or treatment" in the three months prior to the coverage taking effect. (AR 38.) Defendant refers to this three-month period as a "look-back period." (Dkt. 31 at 13.)

---

[1] Orthostatic intolerance is an autonomic disorder in which the body's heart rate increases excessively on standing, and the body has difficulty regulating blood pressure.

[2] Because this case involves only allegations related to the above-referenced claimed disabilities, the Court will forego discussion of plaintiff's other medical issues contained in the Administrative Record.

[3] References to the Administrative Record are designated as "AR".

Further, in order to qualify as disabled, a policy holder was required to receive "Appropriate Care and Treatment and comply[] with the requirements of such treatment," and be unable to earn more than eighty percent of her pre-disability earnings at her own job during the Elimination Period (which was 180 days) as well as the next twenty-four months of sickness or accidental injury. (AR 21.)

Plaintiff ceased working on April 27, 2009. Plaintiff had a history of migraine headaches. On April 27, 2009, she suffered loss of consciousness and vomiting, which she described as looking like coffee grounds. (AR 757.) Plaintiff went to the emergency room at St. Joseph Mercy Health System. During testing, the hospital staff conducted an orthostatic vital sign check, and plaintiff reported a "slight feeling of dizziness while standing." (AR 794.) Plaintiff was diagnosed with an acute upper gastrointestinal ("GI") bleed, symptomatic anemia, syncope, and headaches. (AR 765.) Plaintiff was discharged after her condition had improved.

Plaintiff cites to a series of medical records relating to her issues with dyspnea (shortness of breath) and fatigue following her discharge from the emergency room. (*See* AR 848-51; 856-57; 862, 867.) On May

27, 2009, plaintiff visited Dr. Thomas P. O'Connor, a clinical associate professor at the University of Michigan. He found that plaintiff's stomach symptoms appeared to be resolving, and that her heart and lungs were normal. He also noted that plaintiff reported "some shortness of breath over the last day or two" and a quickened heart rate. (AR 850-51.)

Following her admission to the emergency room, plaintiff applied for and received short-term disability benefits from April 27, 2009 to October 26, 2009. On September 30, 2009, plaintiff first applied for long-term disability benefits. (AR 908.) At the time, plaintiff alleged her disabilities included "[f]atigue, severe migraines, severe stomach pain, [and] inability to eat regularly." (AR 889.)

On November 3, 2009, defendant denied plaintiff's application. (AR 883-84.) Defendant requested specific medical information on October 2, 2009, but plaintiff did not provide it. The letter stated that defendant was "unable to substantiate [plaintiff's] disability or complete the pre-existing review without the medical records." (AR 884.) Defendant did, however, give plaintiff the chance to submit the records again for "April 2009 through current *and* October 1, 2008 through

December 31, 2008" so that it could make a decision based on the merits.  (Id. (emphasis in original).)

On December 11, 2009, plaintiff provided the requested medical records.  (AR 741-882; *see also* AR 103.)  On December 21, 2009, defendant again denied the claim, stating that there was no evidence of any disabling condition other than migraine headaches, which constituted a preexisting condition.  (AR 709-11.)  The letter also provided a right of appeal within 180 days.  (AR 710.)

On January 25, 2010, Dr. O'Connor wrote a letter to defendant stating that "the primary reason for her disability since April 27, 2009, has been fatigue, stomach upset, nausea, as well as shortness of breath and palpitations."  (AR 735.)  On March 18, 2010, Dr. Aman Chugh, a cardiologist, evaluated plaintiff and diagnosed her for the first time with potential orthostatic intolerance and/or chronic fatigue syndrome. (AR 684-85.)  On April 19, 2010, Dr. O'Connor saw plaintiff again, and he diagnosed her with orthostatic intolerance and chronic fatigue syndrome.  (AR 295.)  On May 6, 2010, Dr. Chugh saw plaintiff again as a result of Dr. O'Connor's referral, and after reviewing test results, stated that plaintiff "was found to be slightly orthostatic in the office

5

with Dr. O'Connor," that "[h]er episodes occur on a random basis and are reported as having good days, as well as bad days," and that "this phenomenon . . . has been occurring now for the past year." (AR 285.) Dr. Chugh stated in summary that her "symptoms . . . do correlate with vasodepressor syncope." (AR 286.)

Plaintiff filed her appeal of defendant's denial of benefits on June 16, 2010, accompanied by an affidavit from Dr. Chugh that stated that her conditions of orthostatic intolerance and chronic fatigue syndrome prevented her from performing her job. (AR 702-03.) Defendant sent the medical records to Dr. Christine Lawless, an independent consultant reviewer, for determination as to whether plaintiff was continuously disabled from April 27, 2009, to October 26, 2009, and from October 27, 2009. until the then-present. On September 3, 2010, Dr. Lawless reported that the medical information supported "continuous functional limitations from 4-27-09 to 10-26-09" based on her anemia and migraines, but such limitations were "not clear 10-27-09 and beyond, as anemia has resolved and migraines appear improved." (AR 632.) Dr. Lawless further noted that plaintiff's "orthostasis and fatigue syndrome became predominant around

6

December of 2009 (see Dr. Chughs [*sic*] consult dated 3-18-10), when she experienced 5 weeks of fatigue." (Id.)

On September 3, 2010, another doctor, Dr. R. Kevin Smith, also reviewed plaintiff's records for defendant. (AR 639-47.) Dr. Smith found that the medical information supported significant functional limitations from April 27, 2009, through May 27, 2009, no such limitations from May 27, 2009, until March 18, 2010, and then significant functional limitations again from March 18, 2010 onward. (AR 639-40.)

On September 17, 2010, Dr. Lawless issued a clarification to her September 3, 2010 report. Dr. Lawless stated that plaintiff was significantly limited from April 27, 2009, until August 19, 2009, based on her anemia; from April 27, 2009, until June 10, 2009, based on her peptic ulcer; and that plaintiff's orthostatic intolerance did not become predominant until December 2009. (AR 609-10.) Based on this analysis, plaintiff's only restrictions from August 19, 2009, until December 2009, were "8 hours sitting, 8 hours standing and walking, lifting 10 lbs., pushing/pulling 10 lbs., and use of fine motor movement bilaterally." (AR 610.)

Following these reports, defendant sought an analysis of plaintiff's job requirements.  (AR 155, 163.)  On October 11, 2010, defendant again denied plaintiff's claim, stating that plaintiff did not demonstrate disability on the basis of her non-preexisting conditions between May 27, 2009, and March 18, 2010.  (AR 605.)  The letter defendant sent also noted that, in a conversation with Dr. Smith, Dr. Chugh stated that plaintiff's orthostatic intolerance "can usually be managed with medications and other modifications" and that "patients are usually able to work with orthostatic intolerance."  (AR 605.)  Finally, the letter noted that a Vocational Rehabilitation Consultant (VRC) had reviewed plaintiff's job requirements and determined that plaintiff could perform her own job from August 20, 2009, through November 30, 2009, and became disabled again on December 1, 2009.  (AR 606.)  This letter again indicated that plaintiff had 180 days to appeal her denial of disability benefits.

Plaintiff filed her next appeal on April 8, 2011.  (AR 486-89.)  In addressing the period of time that defendant found she was able to work between August 20, 2009, and November 30, 2009, plaintiff stated that "[i]n the real work world, this would necessarily mean that she

8

would be disable [*sic*] for that entire time.  It is highly unlikely that an employer of a CPA who is an audit manager will tolerate an employee whose work life varies such that she may be disabled one month and not another or need to rest for a portion of the day."  (AR 488.)

On May 19, 2011, defendant obtained another review of the record from Dr. Mark Friedman, a cardiologist.  Dr. Friedman found that "[t]he medical information does support continuous physical functional limitations/restrictions beyond April 27, 2009" based on her orthostatic intolerance.  (AR 442.)  Dr. Friedman also stated that plaintiff "may need to sit or lay down should she experience symptoms of dizziness or lightheadedness related to orthostatic hypotension."  (Id.)  Dr. Friedman contacted Dr. O'Connor, who advised Dr. Friedman that he had not seen plaintiff in the prior four to six months.  Dr. Friedman also attempted to discuss plaintiff's medical issues with Dr. Chugh, but did not receive a return call.

Plaintiff also provided further supporting documentation from other doctors.  (AR 395-7; 399-401.)  In relevant part, Dr. Chugh stated on April 11, 2011, that plaintiff "must be able to lie down during the day if symptoms warrant."  (AR 399-400.)

9

Defendant provided the additional medical records to Dr. Friedman, who again set forth plaintiff's potential need to sit or lay down during the work day. (AR 366.) Defendant then conducted another vocational review. On July 15, 2011, defendant again denied plaintiff's appeal. (AR 356-62.)

In the July 15, 2011 letter, defendant stated that its "consultant advised that the clinical medical information does support continuous physical functional limitations beyond April 27, 2009" based on orthostatic intolerance. (AR 360.) The consultant also stated that plaintiff may need to sit or lay down as needed. (Id.) However, defendant relied on its VRC's assessment that plaintiff "was capable of performing all of the essential duties and functions of her own job as an audit manager" because she would be permitted to "sit as needed." (AR 361.)

Following this, plaintiff submitted additional information to defendant, which defendant sent to Dr. Friedman for consideration. Dr. Friedman certified that the information would not have changed his opinion, and defendant confirmed its denial on September 8, 2011. (AR 243-44.)

10

II.    Standard of Review

In an ERISA case seeking a review of a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), the default standard of review is *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court applies a highly deferential arbitrary and capricious standard.  *Id*. at 115.  "Under this standard, [the Court] uphold[s] the administrator's decision if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d 547, 552 (6th Cir. 2008) (quotation marks and further citation omitted).

The Summary Plan Description ("SPD") attached to the Certificate of Insurance contains a section stating the following:

### Discretionary Authority of Plan Administrator and Other Plan Fiduciaries

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation  or  determination  made  pursuant  to  such

11

discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(AR 53.)   SPDs are federally mandated ERISA plan documents regulated by the Department of Labor under 29 C.F.R. 2520.102-3.

Plaintiff argues that Mich. Admin. Code R. 500.2202, entitled "Insurance Policy Forms – Discretionary Clauses" and in effect as of July 1, 2007, prohibits the enforcement of discretionary clauses in any part of an ERISA plan.  The rule states in relevant part that on or after July 1, 2007, "an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause."  Id. at (2)(b).   The rule further states that on or after July 1, 2007, "a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect."  Id. at (2)(c).   The Sixth Circuit has determined that this rule falls within ERISA's savings clause and is not preempted by ERISA's express preemption clause.  *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604-07 (6th Cir. 2009).

12

To enforce this Rule, insurers are required to submit to the Commissioner of Michigan's Office of Financial and Insurance Services ("Commissioner") "a list of all forms in effect in Michigan that contain discretionary clauses" along with "a certification that the list is complete and accurate." Mich. Admin. Code R. 500.2202(e). The meaning of the word "form" is defined by M.C.L. § 500.2236(1). Mich. Admin. Code R. 500.2201(d).

M.C.L. § 500.2236(1) refers to "basic insurance policy" forms, "annuity contract" forms, "insurance or annuity application" forms, "printed rider or indorsement" forms, "form of renewal certificate[s]," and "group certificate[s]" as forms for the purposes of Mich. Admin. Code R. 500.2202. As the court noted in *Markey-Shanks v. Metro. Life Ins. Co.*, Case No. 12-cv-342, 2013 WL 3818838 (W.D. Mich. July 23, 2013), "[a]n ERISA Plan or SPD is not among the documents subject to approval by the Commissioner." *Id.* at *6.

Plaintiff argues that the SPD was, in fact, subject to approval by the Commissioner, citing a May 1, 2007 letter in which the Commissioner's officer disapproved of a March 5, 2007 statement by defendant that it would continue to act in accordance with the

13

discretionary clause in its summary plan description. (Dkt. 38-3 at 12.) Defendant removed that statement, and the Commissioner approved the forms defendant submitted to it. Plaintiff argues that this shows that the discretionary clause in the SPD was deemed unenforceable by the Commissioner.

That is not, however, what the full, months-long exchange between defendant and the Commissioner reveals. In December 2006, defendant submitted three forms to the Commissioner: forms #G.LTC4097 NH-MI, #G.LTC297 COMP NW, and #G.24303. (Dkt. 38-3 at 3.) On December 21, 2006, the Commissioner objected to discretionary clauses in each of the forms. In relation to this case, the Commissioner objected to the discretionary clause in the long-term disability insurance policy form, #G.24303, which read, "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments." (Id.)

Plaintiff does not contend, nor is there any evidence showing, that #G.24303 was an ERISA SPD. Neither the Commissioner's December 21, 2006 letter nor its May 1, 2007 letter reaches the discretionary

14

clause in the SPD. Instead, it found that defendant's March 5, 2007 caveat regarding enforcement of the discretionary clause in the SPD notwithstanding Michigan requirements for other forms was an insufficient certification that the forms *actually submitted to and considered by* the Commissioner did not contain discretionary clauses.

Accordingly, the Court will apply the arbitrary and capricious standard to this case, based on the reservation of discretionary authority reserved to defendant in the SPD.

III.   Analysis

Defendant denied plaintiff's application for long-term disability benefits four times, although this suit appears to concern primarily the denials that relied on Dr. Friedman's reports. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citation omitted).

As a threshold matter, plaintiff's complaint sets forth that her disability claim is based on both her orthostatic intolerance and her irritable bowel syndrome. Plaintiff does not argue in either her motion

15

or her response to defendant's motion that irritable bowel syndrome would serve as a basis for long-term disability benefits. Further, the record clearly indicates that irritable bowel syndrome was a preexisting condition. (*See* AR 395, 631, 638 (notes from physicians and other medical treaters indicating that plaintiff's irritable bowel syndrome was a preexisting condition).) Accordingly, her claim cannot survive based on her irritable bowel syndrome, and can only proceed based on her orthostatic intolerance.

The first three denials by defendant were not arbitrary and capricious. The November 3, 2009 denial occurred because plaintiff failed to provide necessary medical records for adjudication. The December 21, 2009 denial found no evidence of orthostatic intolerance in the medical record, and indeed, Dr. Chugh would not make his diagnosis of orthostatic intolerance for nearly another four months. The October 11, 2010 denial was based on the findings of two doctors that there was a window of just over three months where plaintiff was capable of performing her job as defined under the plan. "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is

entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

The issue, then, is whether it was arbitrary and capricious on July 15, 2011, for defendant to rely on the certification of its VRC that plaintiff only needed to sit down to accommodate her orthostatic intolerance, and thus that plaintiff was capable of performing the functions of her job.[4]

Plaintiff accuses defendant of "cherry-picking" because it did not rely on plaintiff's statements regarding her disability, and it "discredited without explanation the opinions of its own paid paper

---

[4] Plaintiff also argues that the plan at issue contemplates obtaining a medical examination rather than conducting "paper reviews" such as the ones defendant obtained here. Plaintiff does not, however, indicate what provision in the plan requires a medical examination. The only relevant provision the Court can identify is the "Physical Exams" section of the plan, which states that "[i]f a claim is submitted for insurance benefits, We have the right to ask the insured to be examined by a Physician(s) of Our choice as often as is reasonably necessary to process the claim. We will pay the cost of such exam." (AR 44.) Unless the plan language "expressly *bars* a file review by a physician in lieu of such a physical exam," a paper review is permitted in lieu of a physical exam. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).

17

reviewers." Further, it did not ask Dr. Friedman to clarify whether plaintiff would actually or definitely need to lie down when experiencing symptoms of orthostatic intolerance. (Dkt. 33 at 38.) Citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356 (6th Cir. 2002), plaintiff argues that such "cherry-picking" is impermissible, even under an arbitrary and capricious standard.

In *Spangler*, the Sixth Circuit determined that an ERISA administration acted arbitrarily and capriciously when it requested a transferable skills analysis, but sent only a single report out of the entire medical record to the reviewing doctor. *Spangler*, 313 F.3d at 361-62. This generated an "aberrant" report that was inconsistent with the rest of the record, for the apparent purpose of "obtaining a favorable report from the vocational consultant as to [that plaintiff's] ability to work." *Id*. at 362.

Defendant is accused of two transgressions: first, not asking Dr. Friedman to further clarify whether "may need to sit or lay down" meant that plaintiff would definitely need to lie down, and second, relying on a VRC assessment that disregarded both Dr. Friedman and

Dr. Chugh's statements that plaintiff either "may need to" or "must" lie down when symptoms of orthostatic intolerance are present.

Defendant argues at length that the record demonstrated that plaintiff was not disabled between August 20, 2009 and November 30, 2009, and that this supports each of its denials, including denials on July 15, 2011, and September 8, 2011.

Those latter denials rely entirely on Dr. Friedman's evaluation, which did "support continuous physical functional limitations beyond April 27, 2009." (AR 360.) In other words, the final denial was not based on a finding that plaintiff was not substantially functionally limited, because the only evaluating physician report relied on led to the conclusion that "the clinical medical information supported restrictions and limitations for the non-pre-existing condition[] of . . . orthostatic intolerance/dizziness . . . beyond April 27, 2009." (AR 361-62.) The final denial was based solely on the finding that "the medical information supported that [plaintiff] has the capability of performing her own occupation" because her "job would allow her to sit as needed if she experienced symptoms of dizziness or lightheadedness." (Id.)

Accordingly, the reports previously used as a basis for denial of plaintiff's application cannot justify the subsequent denial of benefits on July 15 and September 8, 2011, when the record is clear that defendant did not rely on those prior reports in making its determination.[5]

Plaintiff argues that, because she might need to lie down due to orthostatic intolerance, and there was no finding that her job could accommodate that need, the defendant's denial was arbitrary and capricious. With regard to the July 15, 2011 denial, she is correct.

Under the arbitrary and capricious standard, a decision must be supported by substantial evidence. In building that support, "a plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006). The consistent medical evidence at the time of the July 15, 2011 decision indicated that plaintiff was both continuously substantially functionally limited since April 27, 2009 (as defendant found in its denial letter),

_____

[5] The July 15, 2011 denial letter, for instance, states that "[defendant] had her entire claim file reviewed by two independent physician consultants; one board certified in cardiology/internal medicine and the other board certified in psychiatry. The consultants reviewed Ms. Hess' entire file, including all office notes, test results and procedure notes submitted." (AR 359.) The cardiologist was Dr. Friedman.

20

and that plaintiff would require the potential accommodation of needing to lie down on the job.

The distinction between Dr. Friedman and Dr. Chugh's notes is small, but critical.  Defendant reads Dr. Friedman's "may need to sit or lie down" as stating that either was an equally sufficient remedy for symptoms related to plaintiff's orthostatic intolerance, and that no clarification from Dr. Friedman was necessary, as sitting was an option always available to plaintiff.  (AR 224.)  Dr. Chugh, on the other hand, stated that plaintiff *must* be able to lie down if the situation warranted.

A denial of benefits based on a reading of Dr. Friedman's note that plaintiff "may need to sit or lie down" to require *only* sitting as an accommodation is arbitrary and capricious.  Defendant arbitrarily disregarded the consistent opinions of both plaintiff's treating physician and Dr. Friedman that plaintiff may need to lie down while working in order to accommodate the substantial functional limitations arising from her orthostatic intolerance.

Plaintiff showed that, based on reliable medical evidence, lying down would be an accommodation possibly required for her to continue working.  Defendant's consultant agreed with this assessment.  No part

21

of plaintiff's job description or any assessment in the administrative record allows for plaintiff to lie down on the job.  Defendant, rather than address this potential accommodation, read Dr. Friedman's assessment not as it actually read, that plaintiff might need to sit or lay down based on her orthostatic intolerance, *but instead that either sitting or lying down would do equally well.*

That is not what Dr. Friedman said.  If he had, then defendant would have offered a reasoned explanation for its denial: sitting would accommodate orthostatic intolerance, and plaintiff's job permitted sitting, so she would still have been able to earn more than eighty percent of her pre-disability earnings at her own job.  Instead, what Dr. Friedman said is that sitting *or* lying down might be required to accommodate plaintiff.  Defendant was required, in assessing whether plaintiff could do her job with her substantial functional limitations, to assess the impact of her potential need to lay down on her ability to do her job.  Defendant did not, and that failure renders its decision arbitrary and capricious.

IV.   Conclusion

For the reasons stated above, it is hereby ordered that:

22

Defendant's motion for summary judgment (Dkt. 31) is DENIED;

Plaintiff's motion for summary judgment (Dkt. 33) is GRANTED;

The Court enters JUDGMENT in favor of plaintiff on her claim to recover benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B); and

Defendant is ORDERED to pay to plaintiff all unpaid long-term-disability benefits owed to her under the plan at issue from the time benefits became payable to the present along with prejudgment interest on those unpaid benefits, and to pay ongoing benefits in accordance with that same plan.

Plaintiff may file a motion seeking reasonable attorney fees and costs.

IT IS SO ORDERED.


Dated: February 17, 2015                    s/Judith E. Levy
Ann Arbor, Michigan                         JUDITH E. LEVY
                                            United States District Judge

## <u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 17, 2015.


<u>s/Felicia M. Moses</u>
FELICIA M. MOSES
Case Manager